In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-24-00199-CR

ALAN ROY HARTZEL, Appellant

V.

THE STATE OF TEXAS, Appellee

_____

On Appeal from the Criminal District Court
Jefferson County, Texas
Trial Cause No. F20-34323

_____

## MEMORANDUM OPINION

Appellant, Alan Roy Hartzel ("Appellant" or "Hartzel") was indicted for causing injury to an elderly person by omission, a first-degree felony punishable by five to ninety-nine years or life imprisonment and a fine of up to $10,000. *See* Tex. Penal Code Ann. §§ 12.32, 22.04(a), (e). The jury convicted Hartzel and, pursuant to the jury's verdict, the trial court sentenced Hartzel to life imprisonment in the Institutional Division of the Texas Department of Criminal Justice.

In a single issue, Hartzel appeals his conviction, contending that the evidence is insufficient to support his conviction. We affirm the trial court's judgment.

## BACKGROUND

When Hartzel called 911 to report that his seventy-five-year-old mother ("Mother") was "semi-responsive" and needed an ambulance, Mother was hours from death.[1] Since emergency responders and hospital personnel believed that Mother died due to inadequate nutrition and medical care, Hartzel, Mother's caregiver, was charged with injury to an elderly person by omission. We summarize the pertinent trial evidence below.

The Firefighters' Testimony

Port Arthur Firefighters and EMTs Dylan Tompkins and Dylan Compton, and now-retired fire captain Brian Simmons ("Tompkins," "Compton," and "Simmons," respectively), testified that they were dispatched to Mother's home in response to Hartzel's 911 call. When they arrived, they observed that the house was cold, in disrepair, and smelled like urine, feces, and "death." In addition, the house, and Mother's room in particular, were so full of furniture, trash, and other items that only

---

[1] We refer to the victim and the civilian witnesses by pseudonyms or familial relationships to conceal their identities. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process"); *Smith v. State*, No. 09-17-00081-CR, 2018 Tex. App. LEXIS 1874, at *1 n.1 (Tex. App.—Beaumont Mar. 14, 2018, no pet.) (mem. op., not designated for publication).

2

one person could enter Mother's room at a time. When Tompkins began to assess Mother, he believed that she was already deceased until she moved and made a sound. Tompkins removed the blanket covering Mother, and as he did so, "a swarm of flies" flew out from under the blanket, and maggots were visible on Mother's person. Mother and her bed were covered in feces, urine, and blood. Rather than continue to assess Mother's condition at the scene, the firefighters decided to transport Mother to the hospital. Hartzel offered to carry Mother to the waiting ambulance, and when the firefighters accepted his offer, Hartzel retrieved a "butcher's apron" and gloves and carried Mother from her bed to a stretcher, where the ambulance attendants assumed Mother's care.

They described Mother as emaciated, and in need of food and medical care. All of the firefighters considered Mother's condition to be the worst they had seen in their years of service. They believed that it would have taken Mother a long time, possibly a month or longer, to deteriorate to the condition they observed.

The Police Officers' Testimony and Body Camera Recordings

Port Arthur police officers Angel Bush, Jennifer Simmons, Matt Bulls, Lawrence Myers, and Tomas Barboza testified that they witnessed Mother's condition and the condition of the house on the date Hartzel reported that Mother was not responsive. They generally confirmed the firefighters' testimony that the house was rundown, cluttered, and smelly, and that Mother was in poor condition.

3

Officer Simmons recalled that she transported Hartzel to the police station so he could provide a statement. During the drive, Officer Broussard called from the hospital "to ask if they wanted to abide by the do not resuscitate order[,]" and Hartzel verbally agreed to the order. Officer Simmons also testified that while they were en route to the police station, Hartzel did not ask about Mother's condition.

Officer Myers testified that during the investigation into Mother's death, he reviewed three years of Mother's bank statements. From February through May 2017, Mother spent money for "[n]ormal everyday supplies[,]" but in May 2017 and continuing to December 2019, Mother's account reflected purchases from liquor stores, smoke shops, and showed purchases of weapons and tactical gear.

Barboza, the detective who interviewed Hartzel, testified that during the interview, Hartzel acknowledged that he was Mother's sole care giver and that he assumed Mother's care, custody, and control. Barboza also recalled that Hartzel mentioned Mother's dementia, which had worsened over the previous two to three months. Although Hartzel told Barboza that Mother "'wanted to die in her house[,]'" Hartzel's "demeanor seemed very wrong to" Barboza.

These officers authenticated their body camera recordings, which the State played during the officers' testimony. While at the scene, Hartzel stated that Mother did not like doctors and last saw a doctor in 2011. Hartzel also advised that Mother had chosen to die at home, but that he called 911 that day because he was not going

4

to continue to watch her suffer. Hartzel further acknowledged that Mother was malnourished and dehydrated because she did not want to eat and that Mother was dirty and infested with maggots because she would not allow Hartzel to bathe her. The officers, however, acknowledged never having met Mother and therefore being unaware of her wishes.

"Julia's" Testimony

Julia testified that she was a retired nurse's aide and had been Mother's neighbor for about thirty-five years. Julia called Mother "a very friendly neighbor[]" who often would visit and chat with Julia. When Julia moved into Mother's neighborhood, Hartzel and his sister, "Ginny" were teenagers. Although Ginny eventually moved out, Hartzel did not. After Ginny left, Hartzel "did start doing a lot of drinking, a lot."

About two or three years before Mother died, Julia noticed that she no longer saw Mother. The last time Julia saw Mother, Mother was not her usual talkative self and did not respond when Julia greeted her. When Julia attempted to visit Mother's house, Hartzel would not permit it, saying that Mother was napping or reading. Julia also recalled that after she no longer saw Mother outside the house, Hartzel bought a lot of alcohol and guns.

Julia recalled that although Mother was a packrat, Mother's house was always clean and neat. Julia was certain that Mother would not have chosen to remain in the

5

condition she was in at the end of her life. The conditions in Mother's house were such that on the day Hartzel called 911, Julia noticed that some of "the paramedics were sick. There was a couple of them leaning over, like, throwing up 'cause of what they saw.'"

Martha Broussard's Testimony and Mother's Medical Records

Martha Broussard ("Broussard") testified that she was the charge nurse while Mother was treated at the Medical Center of Southeast Texas. The records of Mother's care at the Medical Center of Southeast Texas reflect that Mother was admitted at 1:16 p.m. Mother was five feet four inches tall and weighed twenty-seven and one-half kilograms (under sixty-one pounds), approximately half her ideal body weight of fifty-five kilograms. Hospital personnel diagnosed Mother with "unspecified severe protein-calorie malnutrition[,]" and "altered mental status[.]" Personnel further noted that Mother was "very unkempt[,] emaciated[,]" and had "significant bruising/mottling to skin[.]" Broussard explained "mottling" as "a darkened pattern on the extremities that shows you that they're not getting the proper fluids to the extremities."

The records further reflect that Mother was incontinent, was "covered in stool and maggots." Broussard explained that the maggots had "burrowed into" Mother's body and that "when maggots burrow in and flies start coming out, that means they've been there for a while and they've already hatched eggs and are – the flies

6

are coming from it." Although Broussard could not recall how many days it would take to hatch flies in this manner, she agreed that it would take more than a day.

Mother also had multiple "unstageable" decubitus ulcers, including one on Mother's shoulder measuring about one inch in diameter, and one on her hip more than two inches across. Broussard described a decubitus as an open wound typically found on a bony prominence, such as a shoulder or hip. Although, according to Broussard, a decubitus can usually be classified according to its size and depth, some of Mother's wounds were so large that they could not be assigned a stage. Broussard also explained "tenting" as meaning that skin, when pulled up, did not "pop[] back[,]" and indicated that Mother "was basically skin and bones." Broussard testified that Mother's condition could not have happened overnight, and that no patient would choose to be treated that way. In addition, Broussard explained the record entry showing that Mother had a Glasgow Coma Scale score of three by contrasting it to people who are awake, alert, and able to respond physically and verbally, who would have a score of fifteen.

According to the records, when the nurses attempted to clean Mother of the "days, weeks, months" of caked fecal matter and urine, they noticed their efforts appeared to be removing some of Mother's skin. Broussard recalled that the situation was so horrific that the nurses were crying and had to "tag team[]" to be able to address Mother's condition.

The records also show that Mother's pupils were unequal in size, and one was unreactive to light, which Broussard explained as meaning that "there's something going on in the brain." In the attempt to increase Mother's temperature of 87.6 Fahrenheit, the nurses gave Mother warm saline IV fluid and used a Bair hugger, which is a device that "blows warm air[]" on the patient. When the nurses could not detect Mother's pulse, they began CPR. After Hartzel gave a "do not resuscitate" order by telephone, the hospital personnel discontinued lifesaving efforts, and Mother died at 2:54 p.m., approximately an hour and forty-five minutes after she arrived.

According to Broussard, it would take "[s]everal, several months, possibly a year[]" for Mother to have reached the condition in which the hospital personnel saw her, and it would be impossible for a caregiver not to realize that the person needed medical care. Broussard had never heard of a person in Mother's condition stating that they wished to be left alone and remain in that state. Like other witnesses, Broussard testified that despite having "seen tragic things and horrible things," Mother's case was the "worst thing I have ever seen."

Janet Gunter's Testimony

Janet Gunter ("Gunter") testified that she was the manager at Homestead, a business that provides in-home caregivers for senior citizens. Although Homestead does not provide medical services, its employees can do light housekeeping, laundry,

cooking, personal care assistance, and can transport clients to appointments. In 2017, Homestead charged from $17.50 to $20.50 per hour for its services, with a four-hour minimum.

Gunter testified that when a client refuses to eat or bathe, caregivers attempt to "redirect" the client by changing the subject and revisiting it later. If a client soiled themselves, the caregiver would "keep trying[,]" and if Gunter found a client in Mother's condition, she would not permit the situation to continue and would report it to the State as soon as possible.

Dr. Erin Carney's Testimony

Erin Carney M.D. ("Carney") testified that she is a forensic pathologist and that she had performed over 3,000 autopsies. Although Dr. Strauch-Rivers, not Carney, performed Mother's autopsy, Carney reviewed Dr. Strauch-Rivers' report and notes, Mother's medical records, the police report, and the photographs taken at the scene, the hospital, and during the autopsy. Carney agreed with Strauch-Rivers' medical conclusion that Mother died of "complications of long-term malnutrition due to unknown etiology." Carney believed that it took "[a]t least weeks[,]" and possibly months for Mother's malnutrition to reach the state depicted in the photographs. As for Mother's possible dementia, Carney referenced a photograph showing "the widening of the gaps between the folds of the brain. And we see that

9

in atrophy of the brain." This finding supports the proposition that Mother had dementia.

"Ginny's" Testimony

Hartzel's sister, Ginny, testified that she and Hartzel grew up in the house in question. At the time of trial, Ginny lived in Central Texas, where she worked as a paralegal. When Ginny last visited Mother, in December 2019, Mother gave Ginny a check for $8,000 to help Ginny and her family. At that time, according to Ginny, Mother "did not look well[]" but did not seem to be experiencing dementia. When Ginny took Mother to lunch during that visit, Mother ate. When asked about Mother's spending habits, Ginny testified that Mother was frugal and would not have approved of expenditures for guns or tactical armor.

Hartzel's Testimony and Recorded Interview

Hartzel testified that he began living with Mother in late 2005 and that in exchange for room and board, he cooked, did yard work, took care of the cats, and performed similar tasks. Hartzel agreed that the house was in deplorable condition because Mother was a hoarder and he was lazy. During his interview with Barboza, Hartzel stated that Mother had dementia, but in his testimony, he stated that although Mother was "just a little slower than she had been[,]" the word "dementia" did not fit.

According to Hartzel, Mother did not want anyone coming into the house to care for her and "barely tolerated service technicians when she needed the washer repaired or the house rewired. She didn't want anybody else in her house." Hartzel acknowledged having drunk "to excess on occasion," but denied that his drinking was as bad as it sounded. Hartzel explained the weapons in the house by stating that he owned eight of them, Mother owned three of them, and that since they did not live in "the safest of neighborhoods[,]" he bought an AR-15 with Mother's knowledge, to prepare to take a rifle training course.

When questioned about Mother's state of health, Hartzel stated that since Mother "was always clothed[,]" and never mentioned any health issues other than nerve damage in her hand, pelvic fractures, and a bee allergy, Hartzel was unaware of Mother's skin breakdown. Although Hartzel admitted having failed to take care of Mother, he testified that Mother refused to permit him to do so. Hartzel admitted that he had assumed Mother's care and was the one responsible for Mother. In hindsight, Hartzel realized that he "should have been more forceful in feeding her or in attempting to get someone to come in and assist with that[,]" even though Mother wanted to die in her own home. Hartzel did not disagree with the State's characterization of Mother as looking "like she may have been pulled out of an Auschwitz death camp." Hartzel could not remember when Mother last bathed or brushed her hair, and he testified that he last changed Mother's incontinence pad

11

"[r]oughly a week prior[]" to the time the photographs were taken. He explained this delay by stating that Mother would not let him pick her up to change the pad. Hartzel did not disagree that the filth Mother lay in caused her serious bodily injury. Hartzel denied, however, that he failed to provide Mother with her nutritional needs, stating that he "provided them. She didn't take them in."

**ANALYSIS**

Hartzel argues that the evidence adduced at trial was insufficient to convict him of the offense charged, since "the State failed to prove that [Hartzel] intentionally or knowingly caused injuries as alleged in the indictment." Hartzel concedes that although "the State established that [Hartzel] through ignorance, lack of training, inattentiveness, or negligence failed to properly care for his mother[,]" the State did not prove that he acted intentionally or knowingly.

In evaluating sufficiency of the evidence to prove the charged offense, we view all the evidence in the light most favorable to the verdict to determine whether any rational trial of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Under the *Jackson* standard, we defer to the jury's responsibility to fairly resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *See Metcalf*, 597

12

S.W.3d at 855; *Hooper*, 214 S.W.3d at 13, 16-17. The jury as factfinder is the sole judge of the weight of the evidence and witnesses' credibility, and it may believe all, some, or none of the testimony presented by the parties. *Metcalf*, 597 S.W.3d at 855 (citations omitted). We do not reweigh the evidence or determine the credibility of the evidence, nor do we substitute our judgment for the factfinder's. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citation omitted); *see also McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted).

A person commits the offense of injury to an elderly person by omission if he:

(a) . . . intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual:

(1) serious bodily injury;

(2) serious medical deficiency, impairment, or injury; or

(3) bodily injury.

. . .

(b) an omission that causes a condition described by Subsection (a)(1), (2), or (3) . . . is conduct constituting an offense under this section if:

(1) the actor has a legal or statutory duty to act; or

13

(2) the actor has assumed care, custody, or control of a child, elderly individual, or disabled individual.

(c) In this section:

. . .

(2) "Elderly individual" means a person 65 years of age or older.

. . .

(d) For purposes of an omission that causes a condition described by Subsection (a)(1), (2), or (3), the actor has assumed care, custody, or control if the actor has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that the actor has accepted responsibility for protection, food, shelter, or medical care for a child, elderly individual, or disabled individual. [].

Tex. Penal Code Ann. § 22.04(a), (b), (c)(2), (d).

Since Hartzel argues that the evidence is insufficient to prove his *mens rea*, only, we do not address the remaining elements of the offense of injury to an elderly individual.

"Intentionally" and "knowingly" are defined as follows:

(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Tex. Penal Code Ann. § 6.03(a), (b).

14

Injury to an elderly individual is a result-oriented offense, requiring a mental state that relates not to the charged conduct but to the result of the conduct. *See Alvarado v. State*, 704 S.W.2d 36, 38 (Tex. Crim. App. 1985). It is not enough for the State to prove that the defendant engaged in the alleged conduct with the requisite criminal intent. *Lee v. State*, 21 S.W.3d 532, 540 (Tex. App.—Tyler 2000, pet. ref'd). "The State must also prove that the defendant caused the result with the requisite criminal intent." *Id.* (citing *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994)). The jury may infer intent from the defendant's acts and words as well as the surrounding circumstances. *See Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984).

Hartzel does not dispute that Mother was over sixty-five years old or that she sustained a serious bodily injury. *See* Tex. Penal Code Ann. §§ 1.07(a)(46) (defining "[s]erious bodily injury" as including death); 22.04(c). Hartzel instead argues that there was insufficient evidence of his requisite mental state, in that the evidence does not show that Hartzel's poor choices intentionally or knowingly resulted in serious bodily injury.

Hartzel contends he attempted to care for Mother but met with Mother's resistance when he tried to either retain outside help or care for her himself. Hartzel also testified that he was unaware of the extent of Mother's condition and stated he neither intentionally nor knowingly allowed Mother to be harmed. The jury,

15

however, need not have credited or believed the evidence of Hartzel's good intentions and best efforts. *See Metcalf*, 597 S.W.3d at 855.

Hartzel, by his own admission, knew that Mother was not eating as much as she previously ate. Hartzel realized that Mother "couldn't have been well[]" yet he did not seek help. Hartzel's admission that Mother needed help that he could not personally provide and did not obtain, satisfies the statutory definition of "knowing," since Hartzel knew that his continued inaction would cause Mother serious bodily harm. *See* Tex. Penal Code Ann. § 6.03(b).

In addition, the jury could have inferred that Mother must have lost weight due to her diminished food intake, and Hartzel's failure to address Mother's weight loss was evidence that Hartzel intended Mother's death by starvation. In *Proo v. State*, a case addressing injury to a child by omission, our sister court held that "the testimony and medical evidence established that [the victim] had obvious and apparent emaciation . . . that the jury could reasonably infer [the defendant] 'would have noticed' during the times she babysat [the victim]." 587 S.W.3d 789, 810 (Tex. App.—San Antonio 2019, pet. ref'd). Similarly, in this case, there was expert medical testimony that Mother was emaciated, and both Carney and Broussard testified that it would have taken a long time for Mother's condition to have developed. As Broussard stated, Mother's deteriorating state could not have escaped a caregiver's notice. Here, as in *Proo*, eyewitness testimony about the victim's

16

appearance was sufficient to indicate the extent of Hartzel's awareness and knowledge of Mother's condition and need for medical care. *See id.* at 811.

The jury also heard Hartzel's own testimony that he had not changed Mother's incontinence pad for a week and thus determined that Hartzel was intentionally or knowingly failing to attend to Mother's needs. The jury likewise could have considered Hartzel's admission that he did not know when Mother last bathed or had her hair brushed and from that the jury could have inferred that Hartzel acted knowingly and intentionally. In addition, the jury could have believed that Hartzel's refusals to allow Julia to visit Mother constituted Hartzel's attempt to conceal Mother's condition. *See id.* at 813 (citing *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004)) (holding defendant's attempt to conceal incriminating evidence is a circumstance of guilt).

Although Hartzel testified he did not realize how badly Mother had deteriorated, Hartzel told Barbosa that his mother "wanted to die at home." His neighbor, Jeanette Guillory, warned him that his mother needed medical care and he refused to seek treatment for her. The record contains sufficient evidence from which the jury could have concluded that Hartzel knew Mother needed help yet he failed to provide it. We conclude there is sufficient evidence in the record to allow the jury to reasonably infer that Hartzel either intentionally or knowingly caused serious bodily injury to Mother by failing to provide Mother with adequate care, nutritional

17

needs, and medical care or proper medical attention, and we overrule Hartzel's sole issue on appeal.

## CONCLUSION

Having overruled Hartzel's sole appellate issue, we affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on December 9, 2025
Opinion Delivered March 25, 2026
Do Not Publish

Before Johnson, Wright and Chambers, JJ.

18